**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LEATRICE TANNER-BROWN, | : | |
| 11923 Cedar Avenue | : | |
| Hawthorne, CA 90250; personal | : | |
| Representative of the Estate of George W. | : | |
| Curls, Sr., and of the Class of Similarly | : | |
| Situated Individuals | : | Case No. |
| | : | |
| and the | : | |
| | : | |
| HARVEST INSTITUTE FREEDMAN | : | |
| FEDERATION, LLC | : | |
| c/o 5614 Oak Place | : | |
| Bethesda, MD 20817; on behalf of | : | Related to |
| itself and all persons similarly situated | : | Case No. 1:14-cv-1065 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | |
| | : | |
| SCOTT de la VEGA | : | |
| Acting Secretary of the Interior | : | |
| 1849 C. Street, NW | : | |
| Washington, D.C. 20240 | : | |
| | : | |
| and | : | |
| | : | |
| TARA MAC LEAN SWEENEY | : | |
| Assistant Secretary – Indian Affairs | : | |
| 1849 C. Street, N.W. | : | |
| Washington, D.C. 20240 | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiffs, by their undersigned attorney for their Class Action Complaint, allege

upon personal knowledge as to themselves and their own acts, and upon information and

belief (based upon the investigation of their counsel) as to all other matters, as to which

allegations they believe substantial evidentiary support will exist after a reasonable opportunity for further investigation and discovery as follows:

## I.        NATURE OF THE ACTION

1.   Plaintiffs bring this action as a Class Action under Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who are allottees under the Curtis Act of 1898 and subject to the provisions of Section 6 of the Act of May 27, 1908, 34 Stat. 312, (hereinafter the "Act") which retained restrictions against alienation on certain lands allotted to Freedmen minors, who were enrolled members of the Five Civilized Indian Tribes[1].

---

[1] The Five Civilized Tribes allied themselves with the Confederacy during the Civil War and attempted to maintain slaves following the War.  As a result of the Tribes disloyalty to the United States during the Civil War all territory owned by the Tribes was forfeited.  The status of the Tribes was reestablished under Treaties entered in 1866.

The Treaties of 1866 came into existence as a result of the post-civil war reconciliation effort, and provided a means for the Five Tribes to re-establish their government-to-government relations with the United States, following their ill-concerned alliances with the Confederate States of America and long history of slavery. The Treaties addressed a number of issues for readmitting the Five Tribes back into the federal union, including amnesty for all war crimes committed by its citizens, establishment of federal courts in the Indian territory, the settlement of "civilized friendly Indians" within the Tribes and the adoption of all freed slaves and free colored persons into the Tribes as tribal citizens.  Article IX of the Cherokee Treaty is an example, and provides:

> The Cherokee nation having, voluntarily, in February, eighteen hundred and sixty-three, by an act of their national council, forever abolished slavery, hereby covenant and agree that never hereafter shall either slavery or involuntary servitude exist in their nation otherwise than in the punishment of crime, whereof the party shall have been duly convicted, in accordance with laws applicable to all the members of said tribe alike.  They further agree that **all freedmen who have been liberated by voluntary act of their former owners by law, as well as all free colored persons who were in the country at the commencement of the rebellion, and are now residents there in, or who may return within six months, and their descendants, shall have all the rights of native Cherokees:**  Provided, that owners of slaves so emancipated in the Cherokee nation shall never receive any compensation or pay for the slaves so emancipated.

Under the 1866 Treaties, Freedmen and their descendants, were to receive <u>all</u> the rights of native Tribe members.  "All rights" can only be read to mean all rights, including but not limited to, the right of citizenship. <u>See</u>, Appellant Brief, <u>Cherokee Nation v. Nash</u>, Case No. SC-2011-02, Supreme Court of the Cherokee Nation,(emphasis added).

2.   The Act of May 27, 1908, imposed specific and detailed fiduciary duties upon the Secretary of Interior to preserve and protect the interests of minor Freedmen allottees in funds from any source and from leases on land allotted to Freedmen minors and to take all available actions to prevent dissipation or deterioration of these allotments and funds through carelessness, negligence or exploitation of Freedmen minors. This action concerns losses due to breach of fiduciary duties owed to Plaintiffs and mismanagement of trust funds owed to Plaintiff.  Plaintiffs seek an accounting of these funds.

3.   Under  the specific statutory mandate imposed by the Act of May 27, 1908, upon the Secretary of Interior to assure that if land allotted to Freedmen minors, funds derived therefrom and beneficial interest of Freedmen minors, were not being properly cared for by the guardians or curators appointed under the Act by probate courts of the State of Oklahoma, the Secretary was required to act to prevent the beneficial interests in  land and funds from being dissipated, or permitted to deteriorate in value by reason of negligence, carelessness or incompetency of the guardian or exploitation of minor Freedmen.  The specific fiduciary duties imposed upon the Secretary of Interior by the Act of May 27, 1908 includes a statutory duty to account to Freedmen minors subject to Section 6 for funds derived from allotted land.

4.   Notwithstanding demand from Plaintiffs for an accounting of funds from restricted lands during the period that these lands were held by George Curls and not subject to alienation, Defendants have failed to provide the requested accounting.

5.   This action is therefore being instituted to compel Defendants to comply with their statutorily created fiduciary duties under the Act of May 27, 1908, to Freedmen minors,

and for an accounting of funds generated from leases on restricted land held by George Curls and similarly situated persons.

## II.    JURISDICTION AND VENUE

6.  This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, 5 U.S.C. §701, et seq., the Administrative Procedures Act, 28 U.S.C. §1491, The Tucker Act and 28 U.S.C. §1505, The  Indian Tucker Act.

7.  Venue is properly laid in this district under 28 U.S.C. §1391 inasmuch as the defendants reside in this district and all of the fiduciary breaches for which relief is sought occurred in this district.

## III.    PARTIES

8.  Plaintiff, Leatrice Tanner-Brown is the personal representative of the Estate of George W. Curls, Sr., a Freedman who by reason of his interest in restricted allotments under the Curtis Act of 1898, the ante-bellum Treaties of 1866, lost or mismanaged trust funds, has standing to sue the United States for breaches of trust related to losses and mismanagement of trust funds derived from his allotted land.   See, Exhibit A for appointment.  George Curls, was enrolled on the Rolls of the Cherokee Freedmen under the Dawes Act of July 1, 1902.  Cherokee Freedmen Roll, Cherokee Freedman 4304.  At the time of his enrollment, George Curls was five years old, having been born to former Cherokee slave parents in Indian Country, Oklahoma in 1897.

On information and belief, Mr. Curls received forty and twenty acre allotment deeds from the Cherokee Tribe under the Curtis Act.  Under these two deeds, Mr. Curls received Curtis Act allotments equaling 60 acres.  These allotments were received at a point in time when Mr. Curls was a minor.

Under the Act of May 27, 1908, restrictions against alienation of Freedmen allotments, were retained for minors, such as Mr. Curls. Under the Act of 1908 any funds from allotments owned by minor Freedmen were to be controlled and monitored by the Department of Interior. See, Sections 2 and 6 of Act of May 27, 1908. The funds derived from oil, gas, agricultural, hay and pasture leases on Mr. Curls' allotments were subject to the fiduciary duties imposed by the Act of May 27, 1908, on the Secretary of the Department of Interior. The Interior Department has no records of these royalties, despite Mr. Curls' land being leased for oil and gas drilling, and agricultural purposes and having generated substantial revenue. Leases were entered into with the Willard Oil Company, the Prairie Oil Company and the Minnesota Mining Company as the allotted land was located within what was known as the "Cherokee Oil and Gas Belt." Additional leases were entered into in the Cherokee "Agricultural Belt." These leases were entered into with J.C. Starr and Guy Patten for "Hay and Pasture Lands." During the period 1907 through 1915 oil and gas leases and agriculture leases were entered into by Guardian Rathburn Alden on behalf of all of the children of Cherokee Freedman Riley Curls, Willie, Edward, James, George, Stephanie, Clarence, Beatrice and Julius. Each of these children is a member of the putative Plaintiffs' class in this action.

9. Plaintiff, Harvest Institute Freedman Federation, is an Ohio limited liability company. Harvest is comprised of members, including Plaintiff Leatrice Tanner-Brown, and representatives of other now deceased Freedmen with a direct personal stake in receipt of damages for breach of fiduciary duties owed to them by Defendants. The vindication of the rights and interests of these Freedmen is the reason for creation and the existence of Harvest. Harvest brings suit on behalf of these Freedman, who have a right to participate

in this litigation but prefer to be represented by Harvest.  Plaintiff Brown is a member of the Harvest Institute Freedmen Federation.

10. Defendant de la Vega is the Acting United States Secretary of the Interior.  The Department of the Interior is the federal agency with oversight of the Bureau of Indian Affairs and has the statutory duty to enforce, administer and assure compliance by the United States with the terms and obligations of federal law.  Defendant is sued in his official capacity only.

11. Defendant Sweeney is the Assistant Secretary with jurisdiction over the Bureau of Indian Affairs (BIA) which has responsibility for the administration and management of 55.7 million acres of land held in trust by the United States for American Indians, Indian tribes and Alaska Natives and to implement the terms of federal law.  Defendant is sued in her official capacity only.


## IV.     CLASS ACTION ALLEGATIONS

12. Plaintiffs bring this action as a Class Action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons were Freedmen minor allottees of the Five Civilized Tribes on May 27, 1908.

13. During the Civil War the Five Civilized Tribes, the Seminole, Cherokee, Choctaw, Creek and Chickasaw, entered into treaties with the Confederacy, severing their relations with the United States. As a result of these acts of disloyalty, the Five Civilized Tribes forfeited all tribal lands and their status as government wards. In 1866, the United States made treaties with each of the Five  Civilized Tribes, setting the terms on which the tribes would continue to exist within the United States and regain their land and trust beneficiary

status. All of the treaties with the Five Civilized Tribes eradicated slavery within the tribes and provided that the emancipated "Freedmen" would have equal rights within the tribes. Although these Treaties had a common purpose, the provisions of the various Treaties were not identical. However, under the treaties the Freedmen were emancipated and given civic status equal to Indians whether the Freedmen were adopted into the Tribes or not. The following is a summary of the provisions of the treaties pertinent to this action.

**The Seminole Treaty**: The United States entered into its first antebellum treaty with the Seminole in 1866. 14 Stat. 755. The treaty provided that the Freedmen members would have rights equal to those of Seminoles by blood:

> And inasmuch as there are among the Seminoles many persons of African descent and blood, who have no interest or property in the soil, and no recognized civil rights, it is stipulated that hereafter these persons and their descendants, and such other of the same race as shall be permitted by said nation to settle there, <u>shall have and enjoy all the rights of native citizens, and the laws of said nation shall be equally binding upon all persons of whatever race or color who may be adopted as citizens or members of said tribe.</u>

14 Stat. 755, 756. In 1898, the Seminole entered into an agreement with the United States to allot its land held in common to individual members. 30 Stat. 567.  The agreement made no distinction between the Freedmen members and the members by blood.

**The Creek Treaty:**  The United States' treaty with the Creek is similar to its treaty with the Seminole. It provided that the Creek Freedmen would have all the rights of members by blood, including the right to share equally in land and funds:

> [A]nd inasmuch as there are among the Creeks many persons of African descent, who have no interest in the soil, it is stipulated that hereafter those persons lawfully residing in said Creek country under their laws and usages...<u>shall have and enjoy all the rights and privileges of native citizens,</u>

<u>including an equal interest in the soil and national funds, and the laws of said nation shall be equally binding upon and give equal protection to all such persons,</u> and all others, of whatever race or color, who may be adopted as citizens or members of said tribe.

14 Stat. 785, 786. In 1897, the United States and the Creek Nation agreed to terms on which the Creek Nation's common lands would be allotted. 30 Stat. 496, 514. The agreement made no distinction between Creeks by blood and the Freedmen. In 1901, the Creek entered a second agreement with the United States. 31 Stat. 861. Like the first, this agreement made no distinction between Creek Indian and Freedmen members.

**The Cherokee Agreement**: The United States entered into a treaty with the Cherokee in 1866. The treaty of 1866, inter alia is a basis for Appellants' claims here. A treaty with the Cherokee Tribe and the United States was concluded on July 19, 1866. Article IV of that Treaty provided that "...[a]ll of the Cherokee freed Negros who were formerly slaves to any Cherokee, and all free Negros not having been slaves, who resided in the Cherokee nation prior to June 1, 1861...shall have the right to settle in and occupy the Canadian district...<u>and will include a quantity of land equal to 160 acres for each person who may so elect to reside in the territory...</u>" Thus, as in the case of the Choctaw and Chickasaw Freedmen, the <u>Cherokee Freedmen were "adopted into the tribe rand], [c]onsequently, they and their descendants were entitled to participate in the allotment of lands equally with members of the tribe by blood</u>." <u>Ross v. Ickes</u>, 130 F.2d 415 (D.C.C. 1942).

**The Choctaw and Chickasaw Treaty:** The United States entered into a treaty with the Choctaw and Chickasaw Tribes on April 28, 1866. 14 Stat. 769. This treaty provided that the tribes had a choice about how to deal with their Freedmen. If the tribes made their

Freedmen members within two years, the tribes would receive a portion of a trust fund, and the Freedmen would receive 40-acre allotments once the Choctaw, Chickasaw and Kansas Indians had made their selections. If the tribes did not adopt their Freedmen and the Freedmen voluntarily removed themselves to other land within Indian Territory, the tribes would get nothing and the [Freedmen would receive a portion of the trust fund. Id] The Choctaw and Chickasaw resisted adopting the Freedmen, so the Freedmen were not entitled to the 40-acre allotments. In 1883, the Choctaw adopted the Freedmen into the tribe and declared each was entitled to 40 acres. The tribe made no allotments at that time either. Choctaw Nation of Indians v. United States, 318 U.S. 423, 425 (1943). The Chickasaw never did adopt their Freedmen into the tribe.

14. In 1898, the United States enacted the Curtis Act, allotting the land of the Five Civilized Tribes. The land was not allotted earlier under the Dawes Act. In 1908 Congress removed restrictions from Freedmen allotments, except land allotted to minors. Congress imposed specific fiduciary duties on the Secretary of Interior with respect to Freedmen minor allottees. Plaintiffs seek an accounting in relation to funds from land allotted to George Curls and similarly situated individuals.

15. The Class consists of thousands of persons located throughout the United States, thus, the members of the Class are so numerous that joinder of all Class members in impracticable. The exact number of Class members is not presently known to plaintiffs, but can readily be determined by appropriate discovery.

16. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions. Plaintiffs have no interests that are adverse or antagonistic to those of the Class.

17. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by many individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to individually seek redress for the wrongful conduct alleged herein.

18. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a) Does the Secretary of Interior owe fiduciary duties to Freedmen minors under the Act of May 27, 1908;

b) Does the Secretary of the Interior owe fiduciary duties to the descendants of Freedmen minors;

c) Whether the Defendants violated §6 of the Act of May 27, 1908;

d) Whether Plaintiffs and the members of the Class have sustained injury by reason of Defendants actions and omissions;

e) Whether the class period extends from enactment of the Curtis Act until now, i.e. the Class period is July 1, 1898 through the present; and

f) Whether the Defendants owe Plaintiffs an accounting.

## V.    WAIVER OF SOVEREIGN IMMUNITY

19. Plaintiffs bring their lawsuit against federal officials. Plaintiffs hereby assert a clear waiver of sovereign immunity that covers the substantive claims and remedies that they seek. The APA waives Defendants' sovereign immunity for all of Plaintiffs' claims. Section 702 states:

An action in a court of the United States seeking relief other than money damages' and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States.

## VI.    THE DEFENDANTS OWE FIDUCIARY DUTIES TO THE CLASS

20. During the Class Period, the Defendants were mandated the Act to protect Freedmen minors from exploitation.

21. During the Class Period Defendants had a duty under the Act to monitor funds derived from allotments held by Freedmen minors.

## VII.  DEFENDANTS' FIDUCIARY DUTIES TO THE CLASS

22. The specific terms of the Act of May 27, 1908, state:

SEC 6. That the persons and property of minor allottees of the Five Civilized Tribes shall, except as otherwise specifically provided by law, be subject to the jurisdiction of the probate courts of the State of Oklahoma. The Secretary of the Interior is hereby empowered, under rules and regulations to be prescribed by him, to appoint such local representatives within the State of Oklahoma who shall be citizens of that State or now domiciled therein as he may deem necessary to inquire into and investigate the conduct of guardians or curators having in charge the estates of such minors, and whenever such representative or representatives of the Secretary of the Interior shall be of opinion that the estate of any minor is not being properly cared for by the guardian or curator, or that the same is in any manner being dissipated or wasted or being permitted to deteriorate in value by reason of the negligence or carelessness or incompetency of the guardian or curator, said representative or representatives of the Secretary of the Interior shall have power and it shall be their duty to report said matter in full to the proper probate court and take the necessary steps to have such matter fully investigated, and go to the further extent of prosecuting any necessary remedy, either civil or criminal, or both, to preserve the property and protect the interests of said minor allottees; and it shall be the further duty of such representative or representatives to make full and complete reports to the Secretary of the Interior. All such reports, either to the Secretary of the Interior or to the proper probate court, shall become public records and subject to the inspection and examination of the public, and the necessary court fees shall be allowed against the estates of  May be

appointed said minors.[sic]. The probate courts may, in their discretion appoint any such representative of the Secretary of the Interior as guardian or curator for such minors, without fee or charge.

And said representatives of the Secretary of the Interior are further restricted lands, authorized, and it is made their duty, to counsel and advise all allottees, adult or minor, having restricted lands of all of their legal rights with reference to their restricted lands, without charge, and to advise them in the preparation of all leases authorized by law to be made, and at the request of any allottee having restricted land he shall, with out charge, except the necessary court and recording fees and expenses, if any, in the name of the allottee, take such steps as may be necessary, including the bringing of any suit or suits and the prosecution and appeal thereof, to cancel and annul any deed, conveyance,mortgage, lease, contract to sell, power of attorney, or any other encumbrance of any kind or character, made or attempted to be made or executed in violation of this Act or any other Act of Congress, and to take all steps necessary to assist said allottees in acquiring and retaining possession of their restricted lands.

23. Under the Act of May 27, 1908, restrictions against alienation of Freedmen allotments, such as the allotments to Mr. Curls', were not removed. Accordingly, any funds derived from Mr. Curls' allotments should have been accounted for by the Department of Interior under the terms of the Sections 2 and 6 of the 1908 Act. Instead, the Interior Department has no record of these funds. These failures were not innocent. They were the result of a deliberate strategy to swindle land and money from Freedmen.

## VIII. BACKGROUND

24. According to the February 22, 2021 Opinion of the Supreme Court of the Cherokee Nation in Cherokee Nation v. Nash, Case No. SC-17-07:

"On war-torn soil in Indian Territory during Reconstruction, thousands of miles from their respective homelands, the heartbeats of three First Nations, the Cherokees, the Shawnees, and the Delawares, and three continents of flesh tones and cultures, Native Americans, African Americans, and adopted or intermarried-European Americans, were forced to coalesce and weave together a single nation to be known by only one name henceforth: the Cherokee Nation. One hundred and fifty-five years after the 1866 Treaty, (Treaty with the Cherokee, 1866, U.S. – Cherokee Nation of

Indians, July 19, 1866, (hereinafter "1866 Treaty")), native Cherokees must step fully into the promise they made "[o]n the far end of the Trail of Tears." McGirt v. Oklahoma, 591 U.S.__, 140 S. Ct. 2452 (2020). By doing so, the Cherokee Nation, as a whole, lifts itself into the 21st century and sheds the heavy weight of antebellum and the pervasiveness of racism and racial injustice in favor of equality and justice for all.

This action seeks to redress injury to George Curls caused by the Secretary of the Interior's nonfeasance. George Curls was injured by the failure of the Secretary of the Interior to protect him from exploitation of his allotment by his guardians and the Courts of Oklahoma. The Cherokee Supreme Court has recently stated that the Freedmen allotments were entitled to the same paternalistic treatment accorded by the Secretary to Blood Cherokees. The Court stated:

> Unequivocally, Freedmen have rights equal to "by blood" or native Cherokees. Freedmen are men, women, and persons whose "right to citizenship does not exist solely under the Cherokee Nation Constitution and therefore, [their right to citizenship] cannot be extinguished solely by amending the Constitution" to exclude them. Likewise, their right of citizenship cannot be enlarged by its inclusion in the Cherokee Nation Constitution. Freedmen rights are inherent. They extend to descendants of Freedmen as a birthright springing from their ancestors' oppression and displacement as people of color recorded and memorialized in Article 9 of the 1866 Treaty." This action seeks to vindicate the right to an accounting already accorded to so-called Blood Cherokees, to which Plaintiff Curls is also entitled.

25. Plaintiff brings this action as the representative of George W. Curls, Sr. Estate.

26. A pervasive system of corruption and racism was ongoing in Indian Country during the period following the discovery of oil and Oklahoma Statehood, the timeframe when Mr. Curls and his siblings received allotments, See, And Still Waters Run, Angie Deboe, Princeton University Press, 1940. One of the primary methods utilized to circumvent restrictions on alienation of allotments was the practice of allotting land to mixed blood Indians and Freedmen under the Act of 1908. By granting allotments to Freedmen, the protections designed to prevent illiterate and uneducated allottees from being swindled by

unscrupulous persons could be overcome.  In the case of Mr. Curls, he was a resident of Chelsea, Oklahoma, in Rogers County.  His allotment, granted while he was a minor, were located in distant Nowata County in the midst of oil rich Cherokee Country.

According to Angie Deboe:

The Federal Government also assumed the administration of the affairs of the individual allottee.  Because of their inexperience in the control of real estate, the agreements and the various acts of Congress had attempted to safeguard the Indians in the leasing and sale of their allotments.

Leases for agriculture and grazing purposes were restricted in all the tribes. The Seminole Agreement contained regulations to protect the allottee, and gave the Chief supervisory authority.  The Atoka Agreement contained similarly safeguards but its enforcement was left to the Federal courts.  The Creek Supplemental Agreement and the Cherokee Agreement specified that grazing leases for more than one year and agricultural leases for longer than five years should be subject to Departmental approval.  In 1905 Congress authorized the Secretary to investigate any lease of allotted land in the Indian Territory and to refer cases of apparent fraud to the Attorney-General.  The Five Tribes Act provided that all lease contracts longer than one year for the surplus of fullbloods were subject to Departmental approval, and that the homesteads of full bloods could be leased only in cases of old age or infirmity through special authorization by the Secretary.

The Department made elaborate regulations for the approval of long-tenure Creek and Cherokee leases under the agreements of 1902, but few were submitted.  Most lessees preferred to secure contracts from the individual allottee by taking chances on a fraudulent lease of making a legal lease for a shorter period.  In 1906, 1,740 leases were rewritten by the Agency, doubling or even trebling the amount of the rental contract, and fifty were referred to the courts for cancellation; but this number constituted only a small proportion of the hundred thousand allotments.

The Department exercised greater supervision over mineral leases.  No important leasing occurred in the Choctaw, Chickasaw, and Seminole nations, but the oil and gas development of the Cherokee and Creek country was one of the spectacular consequences of allotment.

The Creeks and Cherokees were so strongly opposed to the tribal ownership of minerals provided by the Curtis Act that the Department rejected all applications for leases, except in special cases, until agreements could be adopted in accordance with the Indians' desires.  A few informal permits were granted to Cherokee citizens to mine coal, chiefly for local consumption; a few coal operators working in the Creek Nation were

allowed to continue; and finally in 1902 thirteen oil and gas leases were approved because the lessees showed that they had secured them from the Cherokee government before the passage of the Curtis Act. After the ratification of the Cherokee Agreement these tribal leases were changed to the individual form.

The first oil in the Indian Territory was discovered west of Chelsea by Edward Byrd, who had secured a contract from the Cherokee Nation. He had six wells, drilled to a depth of 165 feed, and each produced a barrel a day. Oil in paying quantities was discovered in the Red Fork section of the Creek Nation in 1901, and great excitement resulted. By that time the Curtis Act had been superseded by the Creek Agreement. This compact provided for the individual ownership of minerals, but since it contained no regulations for leasing and forbade the allottee to alienate his land, the Department ruled that all leasing was illegal. The oil development was accordingly halted, by the town lots in Red Fork and Tulsa were appraised and sold in 1902 and drilling was resumed within the townsights.

Just at that time the Department was given complete control of mineral leasing by the ratification of the Creek Supplemental and the Cherokee agreements. Detailed regulations were adopted in 1903, and leasing developed rapidly. By 1907 there were 4,366 oil and gas leases in effect, covering about 363,000 acres. A deep field extended from the Kansas line along the western boundary of the Cherokee Nation through the Bartlesville and Dewey district, and reached sixty-five miles south to Tulsa in the Creek Nation. A shallow field included Chelsea and Coody's Bluff in the Cherokee nation, and extended up the Verdigris River almost to the Kansas line. The Glenn Pool, a small tract south of Tulsa discovered in 1905, had become one of the most spectacular producing pools in the world.

The lessees began to bid against each other by offering bonuses to the allottees. This amount usually ran from three to five dollars an acre, but in 1907 one minor creek received $43,000 for the lease of a twenty-acre tract in the Glenn Pool. In 1907 one Indian was receiving over $3,000 a month in royalty, several were receiving more than $2,000 each, and many had monthly incomes of over $300. Ironically enough, the main Creek development occurred in the fullblood sections, especially in the broken country where the Snakes had been arbitrarily allotted and where the "newborns" had received the worthless land that remained after the desirable allotments were taken. The grotesque tricks of chance that were to attract national attention to the Five Tribes Indians were already apparent…

The Department collected the royalty from the lessee and paid it to the fortunate Indian by a monthly check. The collections began with $1,300 from the first thirteen leases in 1903-1904, rose to $91,624 in 1904-1905, and soared to $323,555.40 in 1905-1906 and $775,489.15 in 1906-1907.

> Oil men complained loudly of the delay occasioned by Departmental "red tape" in securing approval of a lease, but apparently the industry was not seriously retarded. The regulations aimed to prevent monopoly control, by limits on acreage and strict supervision of transfers; and judging from the alternate expressions of approval and complaint, and the failure of certain attempts to evade them, they were eminently successful. As a result the oil industry was a free-for-all scramble, with the great Mellon and Standard interests, the young oil worker who could scrape together enough money to drill a well of his own, and the gambler who must try one more "sure thing," all entering into the most unrestricted rivalry. <u>The wild, speculative, active spirit of the oil field gave a lurid phase to the early development of the Indian Territory.</u>

See, Angie Deboe, "And Still the Waters Run", (Princeton University Pres., 1940) p. 85.

27. The discovery of oil led to political pressure to make allotments freely alienable. Due to this context, in violation of the fiduciary duties to Freedmen who were often less educated and sophisticated than their former slave masters, the United States, on racially motivated grounds through the Act of 1908, permitted these allottees to be exploited by grafters and speculators anxious to obtain oil rich lands for little or no payment to allottees. The allotments belonging to George Curls were in Nowata County, as stated in the midst of this oil rich territory. The Curls allotment is located North of the lucrative Alluwe Oil Field in the vicinity of the Cherokee Shallow Sands Oil Fields where oil was located a mere thirty-six feet below the surface[2] in 1904.

Allotments in the hands of minor Freedmen were susceptible to being transferred free from the restrictions placed upon allotments in the hands of Native Americans.

The maps that follow demonstrate that George Curls Nowata County allotments being located in an oil rich area.

---

[2] Gary L. Cheatham, "Nowata County, " Encyclopedia of Oklahoma History and Culture, March 28, 2007, and Kenny A Franks, "Petroleum." <u>Id.</u>

Page 1 of 1



http://www.archives.gov/education/lessons/fed-indian-policy/images/territory-map-02.jpg     2/20/2011





28. According to Deboe:

The Five Tribes Act provided that all the rolls should close March 4, 1907.  But some duplications were afterwards cancelled, and 312 names were added by act of Congress in 1914.  The rolls included several small groups that had been incorporated into the tribes, especially about seven hundred Euchees, who formed a part of the Creek Nation, and about a thousand Delawares, who had purchased the right to Cherokee citizenship in 1867.  The quantum of blood indicated by the rolls is somewhat misleading, partly because of inaccuracies in matter that t the time seemed unimportant, and partly because fullblood Indians of mixed tribal descent were classed as mixed bloods.  The final rolls are as follows:

| | INDIANS | | | WHITES | **FREEDMAN** | TOTAL |
|---|---|---|---|---|---|---|
| | Fullbloods | mixed | total | | | |
| Cherokees | 8,703 | 27,916 | 36,619 | 286 | **4,919** | 41,824 |
| Choctaws | 7.087 | 10,401 | 17,488 | 1,651 | **6,029** | 25,168 |
| Miss. Choc. | 1,357 | 303 | 1,660 | | | 1,660 |
| Chickasaws | 1,515 | 4,144 | 5,659 | 645 | **4,662** | 10,966 |
| Creeks | 6,858 | 5,094 | 11,952 | | **6,809** | 18,761 |
| Seminoles | 1,254 | 887 | 2,141 | | **896** | 3,127 |
| TOTAL | 26,774 | 48,745 | 75,519 | 2,582 | **23,405** | 101,506 |

Deboe, p. 47.

Although the law of 1908 had certainly entrusted [the department] with the responsibility of protecting all minor allottees, it was decided at the very beginning to limit such protection to restricted children.  It was, of course, the unrestricted children of Negro, mixed Indian and white, or mixed Indian blood who were subject to the greatest exploitation, but the Department officials believe it wiser to concentrate upon the "real Indians"; as Kelsey said in 1910, with reference to some especially shocking pillaging of unrestricted children, "in my judgment the only remedy … is for the general citizenship of the State of Oklahoma to awake to the fact that the less intelligent residents of the community are being robbed by the connivance of grafters and dishonest officials, and that sooner or later these people who have been robbed will become public charges, and to avoid this ultimate condition  public sentiment with respect to getting what the allottee has must change and the citizens must elect honest officers who will protect the minors, whether they be white, red, or black.

But although the district agents' work was limited by such administrative decisions, there was so much need for reform that like Stolper they

accomplished a great deal.  During the last six months of the first year of their employment they recovered about $548,306.78.  <u>House Reports,</u> 61 Cong., 2 Seas., No. 2273, Vol. II, appendix, 1322-23.  <u>Department of the Interior</u>, Annual Report, 1912, II, 486; Indian Office Files, 72545/08 Five Tribes 311.  Each agent made a monthly report showing the exact sums that he recovered in specific cases, and these amounts were added to form the totals.

<u>Id.</u>

29. Mr. Curls allotment was located squarely within an area known to contain oil.  The failure of the Department to properly account for and monitor funds owed to George Curls' is the injury Plaintiffs seek to redress, initially through an accounting.

30. Under the terms Sec. 6 of the Act of 1908, funds from the allotments held by George Curls were under the ultimate supervision of the Secretary of Department of Interior until Curls reached the age of majority.  Accordingly, all funds generated from  Curls' land were restricted and should now be accounted for by the Secretary.  According to Deboe, as set forth on p. 85, of her writing substantial funds were collected from Cherokee lands in Nowata and Rogers Counties during this period. To the extent these funds are from land owned  by George Curls  ,he is entitled to an accounting.

31. A fiduciary's duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor the assets of his charge.  From the inception of the Class Period, defendants breached this duty of investigation and monitoring with respect to Freedmen.  During the Class Period, none of the defendants or their predecessors made any attempt to effectively monitor or respond to mistreatment and exploitation of Freedmen minor allotments.

32. As a trustee, Defendants owed fiduciary duties to George Curls equivalent to these owed to "By Blood Cherokees" which this Court described as follows:

a. It is clear now that this Court has broad equitable authority to deal with a century or more of trustee nonfeasance and to fashion appropriate remedies, see, <u>Cobell v. Norton</u>, 240 F.3d 1081, 1108-10 (D.C. Cir. 2001) (<u>Cobell VI</u>), but it is also clear that the authority is constrained by traditional doctrinal limits on federal courts that apply in suites against the government, including sovereign immunity and separation of powers.

b. Accordingly, methods that might be unacceptable in a typical trust case, such as statistical sampling, are available here, where I am instructed to strike a more forgiving "balance between exactitude and cost."

c. In these unchartered waters, where the trust is of enormous scope, the trustee of unusual character, and the data affected with such great uncertainty, the law of trusts is a sort of magnetic compass; it cannot be expected to point to due north, or to "map directly" onto this context. <u>Id</u>. at 1078.

d. One useful is not very precise pointer provided by case law is that a trustee may not hide behind obscurity that he himself has created. See e.g., <u>Rainbolt v. Johnson</u>, 669 F.2d 767, 769 (D.C. Cir. 1981)

e. "As to a trustee who fails to keep proper records of his trust it is usually stated that, 'all presumptions are against him' on his accounting, or that 'all doubts on the accounting are resolved against him.'"

f. The rules that identify and govern a breach of the accounting duty for a simple, 25-year trust with a single beneficiary cannot be applied, unaltered, to a 121-year old perpetual trust, managed by civil servants, with rapidly multiplying beneficiaries and a variety of ever-changing assets. Equity seeks "to do justice to all parties, <u>Bollinger & Boyd Barge Serv., Inc. v. The Motor Vessel, Captain Claude Bass</u>, 576 F.2d 595, 598 (5th Cir. 1978) (Emphasis added.)

g. --"its orders are adapted to the exigencies of the case," <u>Taylor v. Sterrett</u>, 499 F.2d 367, 368 (5th Cir. 1974), and it seeks to make accurate evaluations of difficult evidence, not to provide "windfalls" for victims or punishment for wrongdoers. See, <u>Bollinger v. Boyd</u>, 576 F.2d at 598.

33. The trustee's breach of its accounting duty has unquestionably harmed individual plaintiffs (if not necessarily the plaintiff class): their putative damages claims have been prejudiced by the Secretary's failure to generate and retain accurate data about the

disposition of beneficiary funds. These are but a few of the affirmative statements made by this Court concerning duties to Blood Cherokees, including persons disloyal to the United States who forfeited all of their land by reason of their treason. This same extensive paternalistic philosophy however has never been accorded by the United States to George Curls. Or those similarly situated. This action seeks to once and forever rectify this clear racial discrimination.

34. The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always discharge its duty with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or moneyed interests.

35. Defendants breached their duty to avoid conflicts of interests and to monitor Freedmen allotments in favor of alienation to European settlers, Oklahoma statehood, and corporate interests. The United States has never accepted or discharged its fiduciary responsibility unless it was in relation to so -called Blood Indians. The United States continues to try to explain away and circumvent its duty owed to George Curls and similarly situated Freedmen representatives. The blatant racism of the past is being supplanted by intellectual dishonesty and racism today. This lawsuit is to demand that Freedmen finally receive the same economic treatment from the United States as Blood Indians.

### IX.    COUNT I – ACCOUNTING AS REQUIRED UNDER THE ACT

### (Against all Defendants)

36. Plaintiff alleges all that has been alleged above as though fully restated herein.

37. Defendants have a duty under Section 6 of the Act of May 27, 1908 to provide an accounting to George Curls and members of the putative class of funds derived from restricted land held by Freedmen minors.

38. Restricted land held by Freedmen minors generated substantial sums. However due to fraud, exploitation, and defendants' failure to perform the oversight contemplated by the Act to protect the economic interests of this extremely vulnerable class, the appropriate amounts due to Freedmen minors under the leases were not received and can not be ascertained without an accounting.

39. Defendants deny that they owe any fiduciary duty whatsoever to Plaintiffs and in so doing have denied Plaintiffs' demand for an accounting.

## X.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the court enter judgment as follows:

a.   That this Court certify this action as a class action under Rule 23(b)(1), 23(b)(2) and 23(b)(3);

b.   That this Court declare that Defendants owed fiduciary duties to Freedmen minors under the Act of May 27, 1908;

c.   That this Court order Defendants to provide Plaintiffs an accounting;

d.   That this Court award to Plaintiffs reasonable costs and attorneys' fees; and

e.   That this Court grant such other relief as may be just and proper.

Respectfully submitted,

*s/Percy Squire*
Percy Squire (0022010)
Percy Squire Co., LLC
341 S. Third Street, Suite 10
Columbus, Ohio 43215
(614) 224-6528
psquire@sp-lawfirm.com